## WATERMAN STEAMSHIP CORP., Plaintiff,

v.

### James H. BURNLEY, Secretary of Transportation, et al., Defendants.

### Civ. A. No. 87–1686.

United States District Court, District of Columbia.

Aug. 5, 1988.

John P. Meade, O'Connor & Hannan, Washington, D.C., for plaintiff.

George P. Williams, Asst. U.S. Atty., Washington, D.C., for defendants.

James W. Pewett, Russell T. Weil, Kirlin, Campbell & Keating, Washington, D.C., for intervenor Cent. Gulf Lines.

Robert T. Basseches, William F. Sheehan, David B. Cook, Shea & Gardner, Washington, D.C., amicus curiae American President Lines Inc.

*Memorandum Opinion and Order*

SPORKIN, District Judge.

*Introduction*

This case involves one episode in an ongoing battle among several members of

our Nation's Merchant Marine about the transferability of certain rights created by statute—"section 615 authorizations." At the heart of this dispute is the parties' disagreement about how to interpret a statute enacted seven years ago as a stopgap, emergency measure to deal with a shortage of ship construction subsidy funds. This is the third action brought by plaintiff Waterman Steamship Corporation ("Waterman") seeking "to have enjoined and declared unlawful the approval by the defendants, the United States Government, the sale of Section 615 rights (46 U.S.C.App. 1185), to another U.S.-flag operator." Defendants' Opposition at 1.[1]

There are two principal benefits which flow from a section 615 "right" or "authorization," pursuant to which foreign-built U.S.-flag vessels are treated as if they were U.S.-built. One benefit is that the authorization may make the holder eligible for operating-differential subsidies ("ODS")[2]—provided the holder satisfies certain other criteria. The other benefit the holder can derive from a 615 authorization is access to U.S. preference cargoes three years sooner than otherwise would be possible. The possession of a section 615 authorization serves to waive the normally required three year waiting period before a newly documented U.S. flag ship can become eligible for the transportation of federal preference cargoes under Section 901(b) of the Merchant Marine Act of 1936 (46 U.S.C.App. § 1241(b)).[3] Central Gulf

**1.** Waterman also contended that MarAd is without authority to authorize transfers of section 615 rights in *Waterman Steamship Corp. v. Dole,* Civil Action No. 86–3338 (JHG), D.C.D.C., and *Waterman Steamship Corp. v. Dole,* Civil Action No. 87–0750 (JHG), D.C.D.C. These cases were pending before Judge Joyce Hens Green on motions to dismiss for procedural reasons at the time this case was argued before me. Shortly after oral argument in this case, one of the cases, 87–3338, was settled in its entirety. *See* Stipulation of Dismissal, *Waterman Steamship v. Dole,* Civil Action No. 87–3338 (JHG) (Jan. 22, 1988) (attached as Exhibit A to Response of CGL to Plaintiff's Motion for Entry of Judgment as Partial Final Judgment Under Rule 54—hereafter referred to as "CGL's Response to Waterman's Rule 54 Brief"). In the other action, 87–0750, Waterman abandoned its central contention that transfers are prohibited as well as other ancillary contentions regarding transfers pursuant to section 615.

**2.** Operating differential subsidy ("ODS") "is provided to U.S. companies to enable them to operate U.S. flag ships competitively in the U.S. foreign trade by offsetting the excess of U.S. ship operating costs over comparable foreign ship operating costs." *See generally* H.R.Rep. No. 63, 97th Cong. 1st Sess. (1981) at 7–8. Wages accounted for approximately 90 percent of all ODS expenditures in 1981. *Id.*

**3.** The statute at issue in this case, "Section 615," which is codified at 46 U.S.C.App. § 1185, provides:

**Construction, reconstruction, or acquisition of vessels over five thousand deadweight tons in foreign shipyards; preconditions**
(a) The Secretary of Commerce may, until September 30, 1983, authorize an operator receiving or applying for operating differential subsidy under this title to construct, reconstruct, or acquire its vessels of over five thousand deadweight tons in a foreign shipyard if the Secretary finds and certifies in writing that such operator's application for construction differential subsidy cannot be approved due to the unavailability of funds in the construction differential subsidy account. Vessels constructed, reconstructed, or modified pursuant to this section shall be deemed to have been United States built for the purposes of this subchapter, section 1241(b) of this title, and section 391a(7) of this title: *Provided* That the provisions of section 607 of this Act shall not apply to vessels constructed, reconstructed, modified, or acquired pursuant to this section.
(b) The provision of this section shall be effective for fiscal year 1983 only if the President in his annual budget message for that year requests at least $100,000,000 in construction differential subsidy or proposes an alternate program that would create equivalent merchant shipbuilding activity in privately owned United States shipyards and the Secretary reports to Congress on the effect such action will have on the shipyard mobilization base at least thirty days prior to making the certification referred to in subsection (a) of this section.

Section 901(b) of the Act, 46 U.S.C.App. § 1241(b), governs reserved cargoes. Subsection (1) of Section 901(b) provides that a certain percentage of the gross tonnage of certain U.S.-sponsored cargoes "shall be transported on privately owned United States-flag vessels." The statute excludes from such transport any vessels "built outside the United States.... until such vessel shall have been documented under the laws of the United States for a period of three years." Section 901(b)(1)(a), (c), 46 U.S.C.App. § 1241(b)(1)(a), (c). Section 615 waives the

Lines ("CGL"), the defendant-intervenor and the recipient of the 615 rights at issue in this case, is presently not eligible to receive ODS—it therefore claims that it seeks to use the three 615 authorizations it has purchased only to obtain the waiver of the three-year waiting period to ship U.S. preference cargoes.

### The Parties

The principal actors in this case are: 1) plaintiff, Waterman, a common carrier operating U.S.-flag, U.S.-built subsidized vessels in foreign commerce under an ODS contract with the United States. Waterman did not apply for section 615 authorizations and it has not been a transferee of such authorizations; 2) defendants, Maritime Subsidy Board ("MSB"), United States Maritime Administration ("MarAd"), and Secretary of Transportation Burnley, who collectively have the responsibility for authorizing, making, amending and terminating ODS contracts, and allegedly have the authority to authorize the transfer of Section 615 rights to build ships foreign yet have them "deemed" to have been U.S. built; 3) defendant-intervenor, CGL, a common carrier that operates ships under the U.S. flag but does not receive operating subsidies. CGL is the transferee of the three Section 615 authorizations at issue. It paid $1,550,000 to obtain these rights. CGL has not previously been a transferee of any other Section 615 rights; 4) *amicus curiae* American President Lines ("APL"), a common carrier and a party to an ODS contract with the United States. APL operates U.S. flag vessels in foreign commerce. APL also is the transferee of several other build-foreign authorizations (Sec-

tion 615 rights) initially granted to another party by MarAd.

### The Facts

The factual development of this dispute began on September 14, 1982, when United States Lines ("USL") received authorization from MarAd to construct fourteen Jumbo Econship vessels at a foreign shipyard pursuant to section 615. Proposed Administrative Record at 101–104 ("P.A.R. _____"). USL received such authorization because construction differential subsidy ("CDS")[4] funds were unavailable. P.A.R. at 27. Although it was an ODS operator, USL did not receive authorization for any ODS for the subsequent operation of any of the vessels built. P.A.R. at 37. USL had twelve Jumbo Econships built pursuant to the September, 1982, section 615 authorizations.[5] It retained two section 615 authorizations.

On September 30, 1982, Delta Steamship Lines, Inc. ("Delta") received authorization from the MSB to construct up to ten vessels in a foreign shipyard pursuant to section 615 authorizations.[6] At the time of its application, Delta was operating 24 vessels with ODS. Delta, like USL, received the section 615 authorizations because CDS funds were unavailable. Delta constructed three vessels pursuant to the section 615 authorizations. On January 11, 1985, the Maritime Administrator and the MSB authorized Delta to assign one of its section 615 authorizations to United States Lines S.A. ("USL S.A."). The transaction was completed on January 25, 1985.[7]

On November 4, 1986, USL and USL S.A. filed voluntary bankruptcy petitions under

---

three year waiting period for vessels built overseas pursuant to its provisions.

**4.** Pursuant to Subchapter V of the Merchant Marine Act of 1936, construction differential subsidy ("CDS") is provided to U.S. shipyards to enable them to compete with foreign shipyards. The subsidy is based upon the difference between United States and foreign shipbuilding prices. *See generally* H.R.Rep. No. 67, 97th Cong., 1st Sess. (1981) at 6.

**5.** Waterman contends that USL may have failed to meet certain conditions required by MarAd prior to building its twelve ships. *See generally* Waterman's Summary Judgment Brief at 11–13.

**6.** According to Waterman, Delta never satisfied certain conditions required by the MSB to build the vessels under section 615, and also failed to meet other conditions required to operate the vessels with ODS. *See* Waterman's Summary Judgment Brief at 15.

**7.** Waterman contends that MarAd authorized only Delta's assignment of the fourth containership to be built foreign to USL S.A. It claims that MarAd never authorized and Delta never assigned a section 615 privilege to USL S.A. Waterman also claims that Delta never satisfied certain conditions the MSB required it to meet prior to building the fourth containership. *See* Waterman's Summary Judgment Brief at 16.

Chapter 11 of the Bankruptcy Act. The two corporations, acting as debtors-in-possession in the bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York, offered *three* unused section 615 authorizations for sale—the two USL authorizations and the section 615 authorization USL S.A. obtained from Delta. USL, USL S.A. and CGL obtained approval from MarAd for the proposed sale of the section 615 rights to CGL on March 26, 1987.[8] A little more than a month later, CGL prevailed in a bidding contest conducted by the Bankruptcy Court for the three authorizations—and on April 17, 1987, purchased the authorizations for $1,550,000.[9] The federal defendants made the sale of the three section 615 rights subject to certain conditions, including the requirement that CGL obtain approval from MarAd of the commercial characteristics of the vessels to be procured, and that the Navy Department approve the National Defense features of the ships to be obtained pursuant to the section 615 rights.[10] In addition, CGL indicated to MarAd that it intends to operate the three vessels without ODS. *See* March 26, 1987 Letter from CGL to MarAd.[11]

On April 6, 1987, Waterman petitioned the Secretary of Transportation to review MarAd's approval of the transfer of the three section 615 rights. CGL opposed the petition on April 13. No action was taken by the Secretary and the transactions became final on April 21, 1987. Waterman brought this action on June 19, 1987.

*The Case as it was Originally Framed*

Waterman initially brought this suit for "review ... of agency actions ... approving the sale of special statutory privileges authorizing construction of U.S.-flag ocean vessels in foreign shipyards which would be entitled to the benefits reserved to U.S.-built vessels." Complaint at 2. According to the plaintiffs,

> ... these privileges were intended to be available only to subsidized U.S.-flag vessel operators in 1982 to fill their then-current needs. *Their sale or barter was not authorized by Congress.*

Complaint at 2 (emphasis added). The core issue in this case, according to Waterman at that juncture, was the legality of selling section 615 authorizations to the highest bidder. Plaintiff challenged the federal defendants' authority to approve the purchase of these authorizations by either de-

---

**8.** According to Waterman, MarAd never made a "finding that CGL was in either of the two categories set out by the Secretary for section 615 eligibility ("an ODS recipient or an applicant for ODS"). Waterman's Summary Judgment Brief at 18. Waterman's contention that such a finding is necessary implicitly assumes that were transfers permissible, section 615 rights could only be sold to entities that could have received them during the one year window. Because I hold that transfers are not permissible between any parties, I need not consider this issue.

**9.** The initial price asked by the seller for the section 615 rights was $750,000. The final price of $1,550,000 was due to bidding by APL at the April 21, 1987 auction. *See generally In re McLean Industries, Inc. et al.,* Cases Nos. 86 B 12238–41 (HCB).

**10.** *See* Waterman's Summary Judgment Brief at 17–18; *see also* CGL's Summary Judgment and Dismissal Brief at 13 and Exhibit B. There is nothing in the record before me that indicates CGL has ever satisfied any of the conditions MarAd imposed.

At the time it obtained MarAd's approval, and prior to its purchase of the section 615 rights,

CGL stated its plans to use the section 615 rights to procure diesel-powered multipurpose vessels with at least five hatch openings, crane equipped, with the ability to carry under deck both dry and liquid cargoes, as well as containers, and with a deadweight capacity of 35,000 to 50,000 tons. It further stated that it would utilize the vessels in trade between U.S. Atlantic and Gulf ports and Mediterranean to Southeast Asia ports. CGL's Summary Judgment and Dismissal Brief at 12. According to Waterman, however, CGL currently

> ... is negotiating to buy ships called 'PROBO'S' which carry petroleum products, bulk products and oil. These are about as far from containerships as one can get ...

Waterman's Brief in Opposition to CGL's Motion for Summary Judgment at 3. The section 615 rights were originally issued to USL and Delta to permit the construction (or purchase) of containerships. *See generally* P.A.R. at 40, 80 and 101–04.

**11.** Waterman claims, however, that CGL "has every intention of seeking ODS for these vessels when ODS once again becomes available under a new program." *See* Waterman's Summary Judgment Brief (citing Affidavit of J.R. Leyh, Senior Vice President of Waterman at ¶ 13).

fendant-intervenor CGL, or for that matter, any other party. Plaintiff emphasized that:

> The privileges bought by CGL were granted under 46 U.S.C. § 1185, which was intended by Congress to authorize foreign building only by vessel operators receiving or applying for operating subsidy who could not contract for new vessels in U.S. yards at economical prices because of the unavailability of construction subsidy. *They were not meant to be saleable* and certainly were not meant to be sold to unsubsidized operators merely to give them access to U.S.-built vessel cargoes. The defendants' purported authorization of the sales of these privileges was arbitrary, capricious, abused defendants' discretion and was not in accordance with law.

Complaint at 3 (emphasis added). The gravamen of plaintiff's complaint at the start of this litigation, therefore, was that the transfer of Section 615 authorizations was not in keeping with either the plain meaning of the statute or Congress' intent when it enacted Section 615.[12] The fact that plaintiff initially mounted a full fledged attack on the transferability of Section 615 rights is further borne out both by a review of CGL's and the federal defendants' briefs,[13] which address the issue of general transferability, and APL's entry into this case as *amicus* curiae solely to argue that this court should not invalidate the transferability of Section 615 rights in toto—but rather, should decide the case either in favor of CGL's right to be a recipient of 615 rights *or* on one of Waterman's other proposed grounds.[14]

**12.** *See also* Waterman's Summary Judgment Brief at 36–37, where Waterman underscores the fundamental nature of this issue:

> If we have forgotten any element in this arrogation of legislative power by an agency which disagrees with the statutory policy, it is not the *fundamental question* of whether anyone but one who qualified under the words of the statute before October 1, 1982, can ever be qualified under a provision which was so emphatically limited to a "window" of opportunity, a window which was the subject of so much legislative soul-searching. That soul-searching exchange made abundantly clear that the only qualification which could take place had to take place within the time frame of that "window," with the construction period for the ships so qualified to run its course in ensuing years in accordance with standard practice.

(emphasis added).

**13.** *See e.g.* CGL's Response to Waterman's Rule 54 Brief at 3 (characterizing general transferability issue as "core issue" presented by Waterman); *Id.* at 10.

**14.** Waterman has raised a litany of other objections to MarAd's approval of the transfer of the three section 615 authorizations to CGL. Aside from Waterman's fundamental opposition to the transfer of any 615 rights, its principal contention is that only ODS recipients or applicants can be a transferee of section 615 rights. Waterman reasons that because only ODS recipients or applicants could apply for section 615 authorizations under the terms of the statute, *see e.g.* Waterman's Rule 54 Brief at 3 ("As all the legislative history shows, section 615 was enacted solely to enable *existing* and *new* ODS operators to build ships abroad to operate under their ODS contracts *and retain their ODS*") (em-

phasis in the original), that the transferee class must be analogously limited. Waterman further contends that:

> Defendants *did not find,* and the record *before the agency* does not show, that Central Gulf was an operator receiving operating-differential subsidy, or an operator applying for operating-differential subsidy within the meaning of section 615, at any time between the effective date of section 615 and October 1, 1982, or at the time of the transfer to Central Gulf of the section 615 authorizations at issue in this case ... the lack of findings by the MSB on this essential element is a fatal defect, and it cannot be remedied *de novo* before this Court, particularly on an informal basis.

*Id.* at 4 (emphasis in the original). In its principal Summary Judgment brief, Waterman also proposes the following other bases for deciding this case:

1) It claims that due to imperfections in the series of transactions which culminated in CGL's acquisition of the section 615 authorization originally held by Delta, that CGL never actually obtained the section 615 authorization. According to Waterman, USL S.A. only acquired "an ownership interest in a containership to be delivered to Delta" not a section 615 authorization. *Id.* at 34.

2) Waterman also claims, more generally, that "[t]he failure of the many findings and conditions upon which depended the integrity, completeness and finality of the MSB's findings under section 615 as to the Delta, USL, and USL S.A. section 615 privileges gives rise to a problem similar to that of turning a vessel interest into a section 615 privilege. These would-be sellers of section 615 privileges suffered from the disability, so far as this record shows, that they did not have

Plaintiff's complaint, the arguments made by the government, the arguments set forth by the intervenor-defendant CGL, the entry of the amicus, APL, solely to address the issue of general transferability and the substance of the oral argument make it clear that plaintiff initially asked this court to consider the fundamental question of whether a Section 615 authorization can be transferred. After briefly considering the issue of standing, I address that fundamental question.[15]

*Standing*

In order to satisfy Article III standing requirements, a party must " 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.' " *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (footnote and citations omitted).

Waterman challenges the validity of the federal defendants' approval of the transfer of three section 615 rights to CGL. Waterman will be injured by the actions of the federal defendants if CGL, pursuant to the transfer of the section 615 rights, enters three new, foreign-built vessels into

competition with Waterman for U.S. preference cargoes three years earlier than otherwise would be possible. CGL, however, contends that Waterman cannot prove that it will use the new vessels to compete with Waterman and that "nothing has been offered to prove precisely how Waterman has been injured to date, or how and when it will be injured in the future." CGL's Summary Judgment and Dismissal Brief at 33.

█ CGL, however, has provided strong indications that it intends to use the new vessels to compete on Waterman's trade routes. *See* generally Affidavit of J.R. Leyh (Senior Vice President of Waterman) and attached Statement of Erik F. Johnsen (President of CGL). CGL historically operates in those markets where Waterman is currently operating its vessels. *Id.* Furthermore, the record in this case reveals no indication about the sort of vessels CGL will acquire or construct; nor have the federal defendants imposed any apparent limitations on CGL's use of the vessels, either in terms of the type of use or the geographical locations of such use. It would be inequitable to permit CGL to take advantage of the blank check nature of the section 615 authorizations it has obtained to deflect attacks by those who realistically claim they will be competitively harmed by the operation of the vessels.[16] I find that

---

perfected 615 privileges themselves." *Id.* at 35.

.3) It claims that the section 615 applications at issue were made by ODS operators, and involved radically different facts and circumstances from those presented by CGL's application. According to Waterman, "at no time did the MSB attempt to discern whether its 'approval' of a CGL program carried out the purposes of the original approvals or indeed, whether it carried out the purposes and policy of the Act at all ..." *Id.* at 35.

4) Waterman argues that the USL/Delta applications were for containerships and that CGL intends to construct or acquire bulkships. According to Waterman, this shift represents a "total" and "material" change in the vessels to be built and their impact—and hence requires new approvals by MarAd. *Id.* at 35.

5) Waterman claims that the record does not show certain conditions on the effectiveness of the three authorizations to have been fulfilled. *See* Waterman's Rule 54 Brief at 4.

*See also* Brief of APL as Amicus Curiae in Support of Defendants on the Issue of Transferability of Section 615 Authorizations (hereafter referred to as "APL's Transferability Brief") at 6–7 (stressing benefits of deciding this case on grounds unique to this case—namely fact that CGL was not initially eligible to obtain a 615 authorization—and avoiding underlying question of whether a 615 authorization can be transferred at all).

15. *See infra* for my discussion of the effect of Waterman's eleventh hour attempt to withdraw this central issue from my consideration.

16. Waterman, in fact, has offered to drop this lawsuit if CGL would agree not to use the three section 615 authorized vessels at issue to compete on Waterman's essential trade routes for cargoes reserved to U.S.-built ships until they have been documented under the U.S.-flag for three years, pursuant to section 901(b) of the Act (46 U.S.C.App. § 1241(B)). *See e.g.* Waterman's Opposition to CGL's Motion to Dismiss at

the threatened competition for its essential cargoes is sufficient to satisfy the injury-in-fact requirement for standing upon Waterman. *See e.g. Investment Company Institute v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); *Clarke v. Securities Industry Association,* 479 U.S. 388, 107 S.Ct. 750, 754 n. 4, 93 L.Ed.2d 757 (1987). Waterman has asserted an injury in fact, fairly traceable to the agency defendant's conduct and redressable by the relief sought. Waterman has constitutional standing. *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984).

■ CGL, relying on a strained reading of *Clarke v. Securities Industry Association, supra,* also contends that Waterman was not an intended beneficiary of section 615 and hence lacks "zone of interest standing." According to CGL, evidence of Congressional intent to benefit the plaintiff is required for standing. Even under that crabbed conception of the zone of interests test, Waterman merits standing. CGL argues that Congress' only purpose for the September 30, 1982 termination date in section 615:

> ... was to place a limit on the total number of brand new build-foreign licenses that could be issued ... said limitation was prescribed exclusively for the benefit of the U.S. shipyards, which hoped to become competitive again.

> Waterman is not a licensee under Section 615. It could have been a licensee, but it did not even apply. Similarly, Waterman is not a U.S. shipyard. *A fortiori,* Waterman is not within the "zone of interest" of those with legal standing to challenge the transfer of licenses ...

CGL's Summary Judgment and Dismissal Brief at 35. When enacting section 615, however, Congress was not nearly as narrow-minded as CGL suggests. A statute which explicitly allows *only* ODS recipients or applicants to apply for benefits reflects concern about all U.S.-flag carriers that either receive ODS or are eligible to apply for it. Waterman was an ODS recipient at the time the statute was enacted, was eligible to apply for section 615 authorizations, and hence was squarely within the zone of interests Congress sought to benefit.[17]

Moreover, section 615 is not a uni-dimensional statute, but rather, reflects a carefully crafted balance between the interests of shipyards and the interests of U.S.-flag carriers—both those which applied for section 615 rights and those which did not. As a carrier which elected not to apply for section 615 rights, and apparently would not have applied in succeeding years, Waterman is also a beneficiary of the termination provision in the Act. It has a right to enforce that provision—which protects the competitive interests of those operators which did not apply for section 615 authorizations.

In any event, Waterman certainly has standing under the far less demanding "zone of interest" test set forth in *Clarke* and subsequent D.C. Circuit cases. *Clarke* expressly rejected the methodology that CGL urges: the search for specific Congressional intent, in one particular provision, to benefit a particular class of plaintiffs:

> In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it can-

---

2; Waterman's Opposition to CGL's Motion for Summary Judgment at 6–7. CGL has not taken Waterman up on its offer.

**17.** The statute, of course, literally provides "material benefits" solely to those U.S.-flag carriers which apply for and receive a section 615 right. Hence, neither CGL nor Waterman would be a "beneficiary" of the Act if that term is strictly construed to require receipt of a "material benefit." The zone of interests test, of course, requires nothing of the sort. *See e.g. Clarke v.*

*Securities Industry Association,* 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987), *Investment Company Institute v. Camp,* 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971), *Panhandle Producers and Royalty Owners Association v. ERA,* 822 F.2d 1105 (D.C.Cir.1987). Merely because Waterman elected not to apply for section 615 rights, therefore, does not erase the fact that Waterman was within the target zone Congress sought to benefit.

not reasonably be assumed that Congress intended to permit the suit. *The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.*

*Id.* 107 S.Ct. at 757 (emphasis added) (disapproving *Control Data Corp. v. Baldrige,* 655 F.2d 283, 293–94 (D.C.Cir.), *cert. denied,* 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed. 2d 190 (1981), which had required intent to protect or benefit the plaintiff). Here, Waterman's efforts to enforce the termination provision are consistent with the balanced purpose of the statute.

Moreover, the *Clarke* Court indicated that a court may look to the entire statutory scheme to determine whether the plaintiff is in the zone of interest. *Clarke, supra,* 107 S.Ct. at 756, 758. I find that Waterman's enforcement of the limitations in section 615 is also consistent with the broader purposes of the Merchant Marine Act of 1936. 46 U.S.C.App. §§ 1101 *et seq.* [18] Section 615, which temporarily waived the three-year waiting period for foreign-built ships to carry U.S. preference cargoes, provided a limited exception to the Merchant Marine Act's consistent policy of requiring the Merchant Marine to be U.S.-built.[19] Waterman's efforts to prevent agency abuse of the limited authority provided by section 615 is consistent with the

overall purposes and structure of the Merchant Marine Act of 1936.[20]

*Laches, Equitable Estoppel and Waiver*

CGL contends Waterman's action is barred by the doctrines of laches, equitable estoppel and waiver. It is hard to understand CGL's laches argument. CGL initially sought MSB approval for the proposed section 615 transfers by letters dated March 10 and March 16, 1987. CGL's request was approved eleven days later, on March 27, 1987. Only nine days after the proposed transfer was approved, Waterman filed a Petition for Secretarial Review. The approval became final on April 12, 1987 and the Bankruptcy Judge finalized the sale on April 21, 1987. Shortly thereafter, on June 19, 1987, Waterman filed this suit. CGL complains about the "54 day delay" between the finalization of the sale and the filing of suit presumably because of its concern that it may be out of pocket $1.55 million if the sale is disapproved. *See* CGL's Summary Judgment and Dismissal Brief at 38. However, the only time Waterman could have filed suit *before* CGL finalized its sale was between the date the approval became final, *i.e.* April 12, and the date the sale was consummated, *i.e.* April 21. Waterman's failure to file suit during this short nine day gap

---

**18.** Waterman contends that its interest in limiting the transfer of section 615 rights "is consistent with the underlying statutory purposes of the Act ... to support a U.S.-built merchant marine, to support equality between U.S. and foreign vessels, and to avoid subsidizing unfair competition between U.S.-flag vessels." Waterman also has emphasized throughout this litigation its view that the pre-eminent goal is that the Merchant Marine be U.S.-built. *See e.g.* Waterman's Opposition to CGL's Motion to Dismiss at 5 ("While it is true that a modern fleet is a desirable objective, the Act requires that fleet to be U.S.-built, and section 615 was the only exception ever made to that policy of the Act ...") To the extent these are, in fact, the purposes of the Merchant Marine Act, an issue I need not decide, Waterman certainly is capable of representing these views—a viewpoint which otherwise would not be represented either in this court or in the administrative "proceedings" below.

**19.** *See e.g.* H.R.Rep. No. 922, 87th Cong., 1st Sess. (1961), where the rationale for section 901(b) was described as follows:

[T]he present bill is felt to be necessary in order to limit the use of such vessels to protect our shipyards and American operators. This purpose is accomplished by providing that vessels built outside the United States, or rebuilt outside the United States, or presently under foreign registry are ineligible to carry Government-aided cargoes under Section 901(b) of the Merchant Marine Act of 1936 until 3 years after their redocumentation under the American flag.

**20.** Post–*Clarke* decisions by the D.C. Circuit have permitted competitors to sue in circumstances similar to those presented here. *See e.g. Panhandle Producers and Royalty Owners Association v. ERA,* 822 F.2d 1105, 1109 (D.C.Cir. 1987) ("Competitors have a seemingly unbroken record of success in securing standing to challenge decisions involving agency licensing ...") (citations omitted); *National Coal Association v. Hodel,* 825 F.2d 523 (D.C.Cir.1987).

simply is not covered by the doctrine of laches.[21]

CGL's equitable estoppel argument is rooted in CGL's frustration that Waterman has not sued to enforce the termination provisions of section 615 in several other potential "transfer cases." It is without merit. CGL's waiver argument arises out of an alleged private agreement between Waterman and CGL. This alleged agreement is not part of the administrative record and has no bearing on this case.[22]

*Standard of Review*

Actions taken by these federal agency defendants are subject to judicial review pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), which provides that "a reviewing court shall ... hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law ..."[23] The question presented in this case is one of pure statutory construction: Did Congress intend, when it enacted section 615, that section 615 authorizations to build foreign would be freely transferable for profit? In other words, in approving the sale for profit of section 615 authorizations, have the agency defendants acted in accordance with congressional intent, as manifested in the text of section 615 and its legislative history?

▮ Although the agency defendants have concluded that such transfers are permissible, the Supreme Court has stated:

The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.

*Chevron, U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984). A court need not defer to an agency opinion on a question of pure statutory interpretation. Rather, "[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron, supra,* 104 S.Ct. at 2781 n. 9. When construing a statute, "courts may substitute their interpretation of a statute for that of an agency whenever they face 'a pure question of statutory construction for the courts to decide,' rather than a 'question of interpretation [in which] the agency is required to apply [a legal standard] to a particular set of facts.'" *I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 1225, 94 L.Ed.2d 434 (1987) (Scalia, J. concurring in the result) (quoting majority op. at 1220–21); *see also N.L.R.B. Union v. FLRA,* 834 F.2d 191, 198 (D.C. Cir.1987); *International Union, U.A.W. v. Brock,* 816 F.2d 761, 764 (D.C. Cir.1987). *See also Union of Concerned Scientists v. United States Nuclear Regulatory Commission,* 824 F.2d 108, 113 (D.C. Cir.1987) ("When the court faces a 'pure question of statutory interpretation,' the court need not defer to agency opinion, even if the statutory provision at issue admits of some ambiguity.").

In those circumstances, however, in which a court is reviewing an agency's application of a legal standard to a particular set of facts, it "must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program." *Id.* 107 S.Ct. at 1221–22. In such situations, the two-prong test of *Chevron* applies:

First, always is the question whether Congress has directly spoken to the precise question at issue. If the intent of

---

**21.** In addition, CGL was already on notice that Waterman doubted the legality of transfers of section 615 rights. Prior to CGL's closing the deal with USL, Waterman had filed suit against APL regarding other section 615 transactions. *See supra* 1.

**22.** Whether the alleged agreement is enforceable in a court of law is not an issue that is before me.

**23.** *See* Federal Defendants' Memorandum of Points and Authorities in Support of Motion to Affirm Agency Decision and in Opposition to Plaintiff's Motion for Summary Judgment ("Defendants' Principal Brief") at 10.

Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron,* 104 S.Ct. 2781–82 (footnotes omitted).

CGL's, the federal defendants' and amicus APL's contentions notwithstanding, the question presented here is one of pure statutory interpretation. I can clearly discern congressional intent. I therefore need not defer to the agency's opinion about the transferability of section 615 rights.[24]

*Section 615*

■ In this case, using "traditional tools of statutory construction," it is clear Congress never intended to permit the transfer for profit of section 615 rights. Permitting transfers effectively extends the limited authority Congress granted defendants to issue section 615 authorizations and upsets the balance Congress struck when it enacted section 615.

Section 615 was a limited exception to a longstanding policy discouraging the construction of vessels in foreign shipyards. The measure expired at the end of fiscal year 1982. It provided a one year "window" for operators to apply for authorization to build vessels abroad that would "be deemed to have been United States built." According to section (b) of the statute, the statute would have been effective for fiscal year 1983 "if the President in his annual budget message for that year request[ed] at least $100,000,000 in construction differential subsidy or propose[d] an alternate program that would [have] create[d] equivalent merchant shipbuilding activity ..." The President failed to request any funds for CDS in his budget message and section 615 expired by its own terms on the last day of fiscal year 1982. As a result, the agency defendants were stripped of their authority to issue new section 615 authorizations. To permit the transfer of section 615 rights now, which in effect would allow operators to obtain new authorizations almost six years later, would directly contravene stated congressional intent that no more section 615 authorizations be issued after the end of fiscal year 1982.

Congress deliberately chose to incorporate a two-step expiration clause into the statute. In so doing, it sought to achieve two related objectives—each of which can and should be respected. Both would be undercut by allowing the transfer of section 615 authorizations.

The first, and prime, objective of the expiration provision was to induce the President to request at least $100,000,000 in CDS funds or propose the equivalent for fiscal year 1983. According to the House Committee on Merchant Marine and Fisheries:

> The last clause makes section 615 a nullity if certain construction differential subsidies are not budgeted as indicated. It is meant to be an inducement to the Administration to continue the program at the levels it has proposed.

H.R.Rep. No. 97–63, 97th Cong., 1st Sess. (1981).[25] The $100 million minimum commitment required from the President "was adopted due to an expressed fear that once vessel operators are permitted to build foreign, there will be little or no support for pursuing a maritime program or policy for

---

**24.** In any event, as discussed below, the federal defendants' interpretation of section 615 is not only contrary to plainly expressed congressional intent but also is unreasonable. The agency action under review therefore would be invalid under both the first and the second prong of the *Chevron* analysis.

**25.** *See also* H.R.Rep. No. 97–158, 97th Cong., 1st Sess. (1981), U.S.Code Cong. & Admin.News 1981, p. 396 (incorporating section 615 into 1981 Omnibus Budget Reconciliation Act and repeating House Committee on Merchant Marine and Fisheries' language in House Committee on the Budget's Final Report).

an adequate domestic shipbuilding mobilization base." *Id.* The temporary and contingent nature of the foreign-building authority was specifically designed to "spur" the operators and the Administration to provide adequate support for the shipbuilding industry and to develop an overall maritime strategy.[26] In blunt terms, to maintain the operators' right to build foreign for one more year, the Administration was asked to ante up construction subsidies. This quid pro quo arrangement would have been sabotaged had the Administration and the maritime industry realized when the statute was passed that section 615 authorizations would, by virtue of their alleged transferability, effectively be available well after the termination of section 615 authority. Similarly, allowing free transferability would have eviscerated Congress' effort to use section 615's potential second year of authority to build consensus within the maritime industry for funding further construction subsidies. It is hard to imagine Congress acting in such a self-defeating fashion.

The second objective Congress sought to achieve when it included the termination provision in section 615 was to balance the competing interests of the operators and the domestic shipbuilding industry.[27] Section 615 was compromise legislation.[28] The legislative history indicates that the short one-two year duration of section 615 authority was the product of powerful Congressional concern that opening a longer "window" would have too severe an adverse impact on the domestic shipbuilding industry.[29] For instance, during the Mark-up, when the House Committee on Merchant Marine and Fisheries was considering the duration of the section 615 "window," Congressman Tauzin reflected the concern about limiting the impact of section 615 on the shipbuilding industry when he stated:

> "It occurs to me that I would have a lot better feeling about the action we are taking in terms of the *viability of our shipyards* into the future if we could shorten the date in your amendment so that when this bill comes up for yearly reauthorization we might examine the effects and see whether or not we are in fact committing a great many ships to be built overseas."

*Id.* at 23 (emphasis added).[30] *See also* Sea–Land Petition at 11–19. The House Committee on Merchant Marine and Fisheries Mark-up session unmistakably evinces the legislators' intent to limit the section 615 "window" to one year and to prevent operators from using section 615 to "stock up" on authorizations for use or sale in the future. *Id.* at 23–32. As Chairman Jones stated:

> The bill provides a way out for American flag ship vessel operators if CDS funds are in fact not available. *I emphasize*

---

**26.** *See generally* Request of Sea–Land Service, Inc. for Secretarial Review of Actions of the Maritime Subsidy Board (April 30, 1985) (hereafter "Sea–Land Petition") at 12–14. *See also* H.R. No. 97–63, 97th Cong., 1st Sess. (1981), at 40 (Additional Views of House Committee on Merchant Marine and Fisheries Chairman Walter B. Jones) ("Furthermore, the Committee language provides an incentive for operators to support the reinstatement of construction subsidy funding. After fiscal year 1982, the 'go foreign' option will be available only if the Administration requests at least $100 million annually for CDS. Frankly, this provision is intended to spur the Administration to comply with its published projections of at least $100 million annually for construction differential subsidy in the 'out years.' ").

**27.** According to House Committee Chairman Jones, "In considering [section 615], we must balance two equally important interests. We

must allow our fleet operators to stay financially viable. At the same time, we need to ensure the preservation of our shipyards." *Id.* at 40.

**28.** Chairman Jones emphasized that "[s]ince the Amendment is of *temporary duration,* I plan to support it ..." *See* generally "Committee on Merchant Marine and Fisheries Mark-up Session, H.R. 2948, H.R. 3319, H.R. 2596, and H.R. 2526," May 13, 1981 (transcript available at the House Committee on Merchant Marine and Fisheries) (as cited in Waterman's Summary Judgment Brief at 21–27) (hereafter "Mark-up Transcript at ——") at 17–18 (quoted in Waterman's Summary Judgment Brief at 22).

**29.** *See generally* Mark-up Transcript at 17–32.

**30.** *See also* "Sea–Land Petition" at 11–19 (attached to Waterman's Summary Judgment Brief as Exhibit 2).

*that the change in the law is of temporary duration.* Therefore it will provide some emergency relief to our American flag vessels until such time as the Administration and the Congress can develop an overall maritime strategy.

H.R. 97–63, *supra,* at 39 (emphasis added).

The legislative history leaves little doubt that Congress intended to provide certain domestic ship operators limited, emergency relief. To permit transfers now would have the same result Congress sought to avoid by placing a one-two year termination provision in the statute—use of section 615 authorizations to build foreign vessels many years down the road without any Congressional approval.[31] That is the case because permitting the current transfer of section 615 rights would have the effect of preserving an available pool of such unused rights for those operators which have none—yet seek to obtain rights and benefits no longer available because section 615 has expired. The bottom line effect would be to allow operators to obtain section 615 rights *after* the statute has expired. Such a result disrupts the balance Congress sought to achieve and tilts section 615 too far in favor of certain operators.[32]

Defendants and *amicus,* however, have a very different view of Congress' intent. According to CGL, the intent of section 615 was "to obtain, for the benefit of the U.S. merchant marine and our national defense, the *maximum number* of new U.S. flag vessels U.S. flag operators are able to construct with private capital under licenses issued prior to September 30, 1982." CGL's Summary Judgment and Dismissal

Brief at 30. Similarly, APL and the Secretary argue that:

> the overriding purpose of section 615 is to assist ODS contractors to construct new, technologically advanced vessels, and that the purpose could be best achieved by permitting the transfer of section 615 authorizations to alternative qualified ODS operators where the original grantees prove unable or unwilling to implement the authorizations.

APL's Principal Brief at 4 (citing *American President Lines, Equity Maritime Companies, Section 615 Authority,* 23 SRR 670 (Secy., December 23, 1985)). In short, defendants assert that Congress' principal goal in enacting section 615 was to permit operators to obtain modern vessels regardless of their source. In turn, they claim that because transfers maximize *the number of vessels obtained pursuant to* section 615's authority—transfers are permissible.

Defendants oversimplify the legislature's intent. Section 615 was enacted to address a number of divergent policy concerns. Defendants are correct that one of section 615's purposes was to foster a strong merchant marine. To help achieve that goal, the Act authorizes ODS operators and applicants to build-foreign without losing the benefits of building in the United States.

However, Congress recognized that if available over a long period, the right to build-foreign could sap the strength of our nation's shipbuilding industry by shifting domestic demand to foreign shipyards. Such a shift, also would be detrimental in the long run to the strength of our Mer-

---

**31.** *See also* Waterman's Brief in Opposition to Motion for Summary Judgment of Defendant-Intervenor APL, Civil Action No. 86–3338 (JHG) at 4–5 ("The approval of unfettered trading of section 615 privileges to permit foreign projects which were not authorized before September 30, 1982, does not comport with either the letter or the spirit of section 615.").

**32.** Of course, the direct result of allowing such transfers would be an increase in the total number of ships built pursuant to section 615 over the number that otherwise would have been built if transfers were not permitted. *See e.g.* APL's Principal Brief at 20 ("The transferees

are, almost by definition, more likely to use th[e] authorizations to build new ships than the transferors."); *see also American President Lines, Equity Maritime Companies, Section 615 Authority* (reported at 23 SRR 670) (Sec'y December 23, 1985) (attached to APL's Transferability Brief) (hereafter "Secretary's Opinion") at 11 ("[a] policy of transfer would merely increase the likelihood that the existing authorizations will be used"); CGL Summary Judgment and Dismissal Brief at 30 ("Plainly, the bankrupts were incapable of utilizing the licenses to construct three new ships, so without the transfers the licenses would have been wasted.").

chant Marine and our national defense.[33] Section 615, therefore, was enacted with a finite term. As discussed above, another policy goal Congress sought to achieve was to benefit ODS operators such as Waterman and APL. As a result, only certain parties were eligible to apply for section 615 rights. The legislative history indicates the statute was "limited, temporary, emergency legislation," enacted in large part to help subsidized operators satisfy their ODS contractual vessel replacement obligations. *See* Sea–Land Petition at 12.[34]

The main result achieved by the termination provision was to cap or limit the number of ships that could be built pursuant to section 615. Had Congress sought to make available a ready and continuing supply of section 615 authorizations, it certainly could have done so. All it need have done was to enact section 615 without any expiration date. However, after careful consideration of competing policy goals, Congress deliberately chose to incorporate the termination provisions in section 615. In so doing, it effected a delicate balance and made plain its intent that the number of ships constructed pursuant to section 615's authority not be "maximized." That decision should be honored. Permitting free-wheeling transfers of section 615 rights significantly increases the number of vessels operating under the statute's authority, threatens to erode our nation's shipbuilding capacity, circumvents the plain meaning of the statute and thwarts Congress' intent.

Defendants' rationale for permitting the transfer of section 615 rights essentially amounts to an argument for *de facto* renewing the grant of authority to the Secretary. It very well may be that defendants are correct—that more section 615 authorized vessels need to be constructed—and that section 615 should be renewed. How-

33. APL contends, however, that permitting transfers will not have an adverse effect on United States shipyards because once the initial section 615 authorizations were approved, "the maximum number of ships to be built or acquired under section 615 became fixed ... [t]he transferability of section 615 authorizations does not increase that number." *See* APL's Principal Brief at 24. APL's syllogistic reasoning neglects the obvious fact that transfers function to shift unused section 615 rights to operators that will utilize them. *See supra* at 28 32. Transfers therefore prevent section 615 rights from going unused. Anticipated attrition never occurs.

The same problem infects APL's claim that the transfer of a naked section 615 right "is indistinguishable as a logical matter from the transfer of a ship built pursuant to a section 615 authorization." APL's Transferability Brief at 26. *See also Id.* at 17 ("A ship built foreign under a section 615 authorization may be sold after construction and, that being so, there can be no reason to prohibit the transfer of the authorization to build itself."); Secretary's Opinion at 11. The transfer of a ship built overseas pursuant to section 615 does not change the number of section 615 vessels in service. The status quo is maintained. In contrast, the transfer of a right to build foreign almost certainly will have the effect of creating another operational section 615 vessel. Additional problems afflict APL's attempted analogy. While fully constructed ships should be freely alienable, the same cannot be said for paper authorizations. Ships represent large capital investments. To permit the underlying section 615 authorizations to freeze the ownership of such a valuable asset would be tantamount to letting the tail wag the dog. Section 615 rights, in contrast, represent nothing more than a completed application. Freezing such an asset prevents the accumulation of windfall profits at the expense of the United States government. *See infra.*

34. The limited, emergency nature of the section 615 window was stressed by Senator Trible during a 1983 debate in which he opposed the creation of another exception to the requirement that subsidized vessels be built in the United States:

> Let me take just a moment to put this matter in perspective. The cornerstone of American maritime policy has been that shipping companies that receive operating subsidies must build ships in the United States. There was an exception made to this longstanding policy during fiscal year 1982 [by section 615] and companies receiving operational subsidies from the Federal Government were permitted to go outside the United States and build or buy ships. *That window of opportunity has now passed.*
>
> Regrettably, the shipping interests represented by these amendments did not take full advantage of that window of opportunity, and we are now being asked to give them special treatment. This is special legislation and ought to be rejected.

129 Cong.Rec. S15,912–13 (daily ed. November 10, 1983) (emphasis added). Of course, had the "shipping interests" believed that section 615 rights were transferable, it is unlikely they would have sought special legislation.

ever, that is an issue that neither this court nor the agency defendants is authorized or able to decide. It is a question reserved for Congress. *See generally* Transcript at 59–61.

### Profiteering

Perhaps the most troubling aspect about the concept of permitting private parties to buy and sell section 615 foreign building privileges is the unabashed profiteering that concomitantly takes place. In this case, CGL purchased three unused section 615 rights for $1.55 million. The recipients of this windfall, USL and USL S.A., did virtually nothing to earn this substantial sum. USL S.A. merely purchased its section 615 right from a third party, perhaps for speculative purposes, and re-sold it to CGL. The number of such sales exceeds twenty.[35] In the typical scenario, the seller does *nothing* to earn the sale price beyond merely having successfully applied for the section 615 right before the authorizing period came to an end. Nothing in the statute or the legislative history indicates that Congress ever contemplated that private companies would sell government-created rights for tremendous profits. Congress did not want section 615 rights to be available at any price after the expiration of section 615 authority. Congress certainly did not intend to permit substantial windfall profits to be collected by operators in a sort of "futures market" without regard to public policy concerns. It is obvious that any revenues derived from the sale of such naked rights should accrue to the United States government.

### Administration of Section 615 and the Administrative Procedure Act

█ Even if the section 615 rights were transferable under the terms of the Act, MarAd acted improperly by failing to follow APA notice and comment procedures when it decided to permit transfers. This is too important a matter for the shipping industry to be carried out on a case-by-case basis and by ad hoc decision-making. A rulemaking was necessary. Standards are needed. Contrary to the practice in this case, interested parties should at the very least receive notice and an opportunity to be heard before a program allowing such transfers is inaugurated. *See* Transcript at 17. In fact, the entire issue should be fully aired by all interested parties. Standards for transferability must be carefully considered. The danger of profiteering must be addressed and the government's share, if any, of the revenues generated by transfers must be determined. In a case such as this, these kinds of issues should be considered on an industry-wide basis, similar to the way in which they were considered when Congress passed the underlying legislation.

### Waterman's Withdrawal

Subsequent to the summary judgment argument in this case, Waterman has advised the court that it does not want this case to be decided on the general transferability issue. Since Waterman, however, has refused to drop its entire case, it is not in a position to tell me on what basis I should decide its motion. In general, a court cannot be circumscribed by the parties as to what it may say in arriving at its decision or on what basis it may decide a case. It is troubling that Waterman has given no real explanation for its change in position. In any event, since the case is still before me, I am rendering my decision on the basis that I believe is most appropriate and therefore reject the request made by Waterman.[36]

---

**35.** *See* APL's Principal Brief at 3, n. 4 (MarAd has approved transfer of 22 section 615 authorizations); Transcript of Oral Argument at 62.

**36.** Waterman seems now to be taking the position that it has not raised the issue of general transferability. This is obviously contrary to the record. *Compare e.g.* Complaint at 2 ("That sale or barter was not authorized by Congress.") *with* Waterman's Reply to CGL's Reply to Waterman's Motion Rule 54 Brief at 5 ("The pleadings show that Waterman *never* wanted to litigate the issue of general transferability ..."). *Compare also* Transcript at 3–7 ("Your Honor, we are not abandoning at this time the fundamental issue that you are speaking of ...") with Waterman's Rule 54 Brief at 5 ("Waterman does not wish to be 'stuck' defending an issue which was not raised below or on the facts of this case"). I have taken the later assertions as an oversight because if intentional I would think

### Conclusion

For the foregoing reasons, Waterman's Motion for Summary Judgment is granted.

### Relief

It is hereby DECLARED that the transfer of section 615 authorizations is unlawful.

It is hereby ORDERED that defendants are enjoined from approving, allowing or in any way permitting CGL to construct vessels in foreign shipyards pursuant to rights obtained under 46 U.S.C.App. § 1185 contrary to the determination made this day by this court, and it is further

ORDERED that defendants are enjoined from approving the transfer of any section 615 authorizations to build or acquire any vessel or in any other fashion allowing the use of any section 615 authorization by CGL to operate in competition with Waterman or otherwise contrary to 46 U.S.C.App. § 1185 as interpreted by this court this day, and it is further

ORDERED that this case is hereby remanded to MarAd for further proceedings in accordance with this opinion, and it is further

ORDERED that this court shall retain jurisdiction to provide whatever additional relief may be required.

that the possibility of invoking sanctions against plaintiff and its counsel might be in order.

I must add that for this court to decide the issue on the narrow grounds that Waterman has suggested, particularly in light of Waterman's heavyhanded tactics, would do violence to the concept of an independent judiciary and would dictate an unacceptable means of dispute resolution. *See* Waterman's Rule 54 Brief at 2 (threatening to concede on appeal if case is decided on general transferability basis rather than one of the grounds urged by Waterman). Moreover, it is neither practically nor logically sensible to "jump over" or skip the underlying issue of transferability to directly reach the grounds for deciding this case proposed by Waterman. That is because before one can determine which parties can receive transferred section 615 rights, one must first decide the predicate issue of whether they can be transferred at all.